**In re Chaim EINHORN Vacation Planning Center, Inc., Debtors.**

**Bankruptcy No. 182–11949–260.**

United States Bankruptcy Court, E.D. New York.

March 27, 1986.

See also, Bkrtcy., 33 B.R. 665.

Kensington, James & Ressler, New York City, for debtors; Howard D. Ressler, of counsel.

Oliner and Oliner, New York City, for petitioning creditors; S. David Oliner, of counsel.

## DECISION AND ORDER

CONRAD B. DUBERSTEIN, Chief Judge.

### FACTS

These cases were commenced on July 29, 1982 with the filing of separate involuntary petitions in bankruptcy against Chaim Einhorn ("Einhorn"), individually and Vacation Planning Center, Inc. ("Vacation"), (collectively, the "debtors"), a travel agency of which Einhorn was president and sole stockholder. The petitions were filed by three airlines, Pan American World Airways ("Pan Am"), British Airways ("BA") and Trans World Airways ("TWA") (collectively, the "petitioning creditors"). They alleged that the debtors were generally not paying their debts as they became due, thus entitling the creditors to entry of orders for relief against both debtors pursuant to Chapter 7 of the Bankruptcy Code.[1] The creditors contended that Vacation, which was a travel agency appointed pursuant to a Standard Passenger Sales Agreement with the Air Traffic Conference of America (the "ATC Agreement"), failed to remit to them the proceeds of tickets which it sold on behalf of each airline. The creditors maintained that the debtors owed them the following amounts:

| | |
|---|---|
| Pan Am | $498,367.58 |
| TWA | 210,364.71 |
| BA | 309,639.63 |

It is further undisputed that subsequently the sum of $250,000 was paid to the above creditors and after allocating a portion thereof to each, the following amounts remain due and owing:

| | |
|---|---|
| Pan Am | $341,462.47 |
| TWA | 174,922.92 |
| BA | 251,981.53 [2] |

Einhorn individually and as the sole representative of Vacation, interposed answers to the involuntary petitions, stating in essence, that he lacked sufficient information to form a belief as to the truth of the allegations or that he declined to answer on the ground that it might tend to incriminate him. In accordance with discovery rules 26–37, Fed.R.Civ.P., made applicable to bankruptcy by Bankruptcy Rule 114 (presently Bankruptcy Rule 1012), the debtors appeared for examination before this court regarding the issues raised by the involuntary filings.[3] At the Rule 1012

1. We observe that Section 303(h) as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (Pub.L. No. 98–353) applies to this case since it was pending on July 10, 1984, the date the 1984 Amendments were enacted. 11 U.S.C. § 122(a).

   Section 303(h) of the Bankruptcy Code provides in pertinent part:

   (h) If the petition is not timely controverted, *the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed.* Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—

   (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts that [sic] are the subject of a bona fide dispute....

2. During the early course of this case and also during the trial this court was informed by both the attorney for the creditors and the attorney for the debtors that criminal proceedings had been instituted in the Supreme Court of the State of New York Criminal Division, Kings County (People of the State of New York v.

   Einhorn, Indictment No. 3140 R/79), seeking the conviction of Einhorn for criminally converting proceeds of airline tickets. The court further learned during the course of the trial that Einhorn pleaded guilty to one count of grand larceny for which he served a one year jail sentence on weekends. As part of a plea bargaining agreement, Einhorn made restitution of the above-mentioned $250,000.

   Although the foregoing information was made known to this court by way of statements made by the attorneys for the debtors and for the creditors, as well as in the debtors' memorandum (Putative Debtors' Post-Hearing Memorandum of Law at 2), the court sustained the debtors' objections to deeming in evidence a portion of the transcript of the plea bargaining hearing on the grounds of Einhorn's claim to the Fifth Amendment privilege.

3. Rule 1012 of the Bankruptcy Rules of Procedure provides in pertinent part:

   (a) Discovery. When a petition commencing an involuntary case under Section 303 of the Code alleges that the debtor is generally not paying its debts as they become due, and the debtor denies the allegation, discovery may be in accordance with Rules 26–37, F.R.Civ.P.

hearing Einhorn invoked his Fifth Amendment privilege against self-incrimination by refusing to testify and by failing to produce his books and records as well as those of Vacation. This court thereupon invoked sanctions against both debtors in accordance with Rule 1012(b) and pursuant to its provisions, orders for relief under Chapter 7 were entered against both debtors.

The debtors appealed from entry of the orders for relief. On appeal the District Court found that Einhorn had established a plausible, factual basis for his Fifth Amendment claim and remanded the cases to this court for hearings on the issues raised in the involuntary petitions, consistent with the debtor's constitutional right to assert the Fifth Amendment.

The petitioning creditors again conducted discovery pursuant to Bankruptcy Rule 1012. Einhorn appeared before this court for pre-trial examination by them. Einhorn's attorney prefaced the hearing by summarizing the factual basis upon which Einhorn would invoke the Fifth Amendment. He stated that Einhorn faced potential criminal prosecution under federal statutes including the use of the mails to defraud, fraud by wire, engaging in a pattern of racketeering (referred to as RICO), the transportation and/or sale of stolen goods in interstate commerce, income tax evasion and flight to avoid prosecution. (Tr. of 5/24/84 at 7).

Einhorn testified that he was the president of Vacation and its sole officer. He asserted that he had authority to make rent payments for Vacation and did so by check. *Id.* at 20. He also testified that it had been more than five years since he had custody of Vacation's books and records, that he did not presently have possession of them and that he did not know where they were. *Id.* at 9–19. He invoked the Fifth Amendment and refused to answer questions regarding whether he personally kept any financial records or employed an accountant and whether he owed debts to the

telephone company, Con Edison and his landlord at the time the petitions were filed. *Id.* at 43. The petitioning creditors thereafter proceeded to a trial of the allegations raised by the involuntary chapter 7 petitions.

In order to establish the allegations in an involuntary chapter 7, it is necessary for the petitioning creditors to prove: (i) that they hold claims aggregating at least $5,000 in unsecured debt, (ii) that the debtors were generally not paying their debts as such debts became due, and, (iii) such debts were not the subject of a *bona fide* dispute. 11 U.S.C. Sections 303(b) and (h). One witness testified on behalf of each of the petitioning creditors. Einhorn was the fourth and final witness. The court received numerous documents in evidence.

A staff assistant of TWA was the first witness to testify. She explained the procedure utilized by a travel agent for the sale of airline tickets to the general public and remittance of the proceeds of those sales to the airline whose ticket was sold. She testified that a travel agent writes a ticket on approved "stock", that is a blank ticket impressed with the appropriate airline's plate. The travel agent then submits the ticket coupons and proceeds of the sale by midnight of the following Tuesday to a "settlement bank", which, upon receipt, distributes them to the appropriate airline. When a passenger uses the ticket it is processed by the airline. If the airline has not received the travel agent's coupon and remittance from the settlement bank, it categorizes the ticket as an "unrecorded sale". According to the witness, the usual procedure at TWA for an unreported ticket was to process a Debit Memo form to the appropriate travel agent advising it that there was an unreported sale and that the money must be paid to the airline either directly or through the area settlement bank. In summary, the witness' testimony was that Vacation had sold TWA tickets to

(b) Sanctions. If the debtor fails to appear, produce records, or submit to examination or deposition, the court may enter an order for

relief or other appropriate order, in addition to the sanctions available under Rule 37 F.R. Civ.P.

airline passengers but had not sent it a matching payment.

The Debit Memos which were issued to Vacation together with supporting documentation were placed into evidence. According to the witness, the Debit Memos represented tickets presented by passengers for which TWA had no record of a matching remittance from the area settlement bank. From those documents the witness testified that debts due TWA from Vacation prior to filing of the involuntary petitions were not paid. (Tr. of 10/10/84 at 20). A letter from TWA to the ATC dated May 19, 1980 prior to filing of the petitions indicated that there was $205,088.24 due TWA from Vacation on that date. *Id.* at 15.

The witness for Pan Am, one of its collection managers, testified that its practice of dealing with travel agents who sold tickets to the general public was identical to that employed by TWA. Debit Memos and supporting documents placed into evidence indicated that over $400,000 was due Pan Am from Vacation. The witness testified that these debts were due and owing to Pan Am from Vacation on the day the involuntary petitions were filed.

The parties also stipulated that the testimony of an employee of BA would demonstrate that its practice with respect to travel agents, ticket sales and reporting procedures would also be identical to that of TWA. Debit Memos of BA and supporting documentation were submitted into evidence indicating that over $250,000 was due BA from Vacation at the time the petitions were filed.

The final witness to testify at the hearing was Einhorn. He continually invoked the Fifth Amendment. The attorney for the petitioning creditors thereupon sought to establish that Einhorn, acting on behalf of Vacation, had signed Vacation's corporate documents and pertinent financial data including checks, bank signature cards, bank resolutions and Amendments to the ATC Agreement. He refused to admit that the signatures appearing on those documents signed by Einhorn purporting to be his were actually his. In order to establish that the signatures were actually his, the attorney for the petitioning creditors sought and obtained the direction of the court, to have Einhorn provide examples of his signature. These were compared by the court to the signatures on the documents.[4] The court found that where Einhorn's name appeared as a signature on behalf of Vacation, the signatures were identical to the exemplars. All documents were then received and marked in evidence.

The debtors argue that the petitioning creditors have failed to establish that the debtors were generally not paying their debts as they became due on the date the petitions were filed as required for involuntary relief. Moreover, the debtors contend that the petitioning creditors presented no proof that there were any undisputed debts due and owing to them by the debtors on that date. Rather, the debtors assert that the only competent evidence adduced was creditor records reflecting "discrepancies" in sales and not debts. (Debtors' Post-Hearing Memorandum at 17).

The creditors maintain that based upon the testimony given and documentary evidence submitted they have established that Vacation owed them debts at the time of the involuntary filings based upon tickets sold on their behalf for which Vacation never transmitted the proceeds. They maintain that Einhorn is individually liable

---

**4.** Rule 901 of the Federal Rules of Evidence provides in pertinent part:

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

. . . .

(3) Comparison by trier or expert witness. Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

to them as the sole officer of Vacation. They also argue that Einhorn is liable to them on a trust theory. They contend that the ATC Agreement entered into by Vacation and the ATC created a trust relationship between Vacation and the airlines. Consequently, they argue that Einhorn is individually liable for Vacation's debts to them as a breach of the fiduciary duty flowing from that trust inasmuch as he was in control of Vacation.

In opposition, the debtors argue that despite trust language in the ATC Agreement, the relationship between the airlines and Vacation was not a trust, but a debtor-creditor relationship.

### ISSUE

Did the petitioning creditors establish that the corporate and the individual debtors failed to pay their debts as they became due as required for entry of an order for involuntary relief pursuant to Section 303(h) of the Bankruptcy Code?

### DISCUSSION AND CONCLUSIONS OF LAW

#### A

We turn first to the involuntary petition filed by the creditors against Chaim Einhorn as an individual. Initially, the petitioning creditors must establish that they are in fact owed debts by the debtor. Here we find that the creditors have failed to establish that with respect to Einhorn.

■ First, the petitioning creditors allege that Einhorn was individually liable as a result of his position as the sole officer and control person of the corporation. While it is true that a person involved in the operations of a corporation and holding the position of sole corporate officer might act to the detriment of his corporation, those actions are not translated into misdeeds against a creditor asserting rights in the bankruptcy court. For example, in *In re Baiata*, 12 B.R. 813 (Bkrtcy.E.D.N.Y. 1981), decided in this District, a creditor of a corporation brought suit against a debtor who was the sole officer of that corpora-

tion. The creditor alleged that the debt owed her by virtue of the corporation's breach of contract was nondischargeable pursuant to 11 U.S.C. Section 523(a)(4). She contended that the breach was a wrongful act in the officer's fiduciary capacity making him liable for the obligation. The court held that:

> "[e]ven assuming *arguendo* that there existed a sufficient fiduciary relationship ... the wrongdoing alleged was not to the plaintiff or her interests but rather involved an allegedly wrongful act by the debtor to ... his own corporation."

*Id.* at 818.

■ Next, the petitioning creditors argue that Einhorn was individually liable to them based upon a trust theory. They assert that the ATC Agreement entered into by Vacation and the ATC established a trust relationship. Consequently, they contend that Einhorn was individually liable to them as a result of a breach of a fiduciary duty flowing from that trust.

We find that despite express language in the ATC Agreement between Vacation and the airlines purporting to create a trust relationship, no such relationship was established. Rather, a debtor-creditor relationship was formed.

In *In re Paley*, 8 B.R. 466 (Bkrtcy.E.D. N.Y.1981), another case in this District, it was held that an ATC Agreement on all fours with the type of Agreement at issue did not create a trust relationship. Accordingly, it was found that the principal of the corporate travel agent had no fiduciary obligation with respect to the proceeds of ticket sales. The court stated:

> The plaintiff has rested its entire case on the submission of the Agreement. It is true that paragraphs 4 and 5 of the Agreement do contain the term "trust". However, taken in its entirety the Agreement appears to be no more than an ordinary commercial contract. It should be noted that the Agreement does not require the defendants to segregate the funds prior to paying the plaintiff. Moreover, the plaintiff neither alleged

nor submitted any evidence establishing that the defendants were under a duty to segregate funds received from the sale of plaintiff's tickets. *Cf. Lord's Inc. v. Maley,* [356 F.2d 456, 459 (7th Cir.1966)]. (parties may establish a fiduciary relationship by providing in an agreement for segregation of funds)

*Id.* at 469.

We also find persuasive the First Circuit opinion *In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981), in which the court held that language virtually identical to the language at issue here did not create a trust relationship.[5] *Morales* involved an attempt by Eastern Airlines to recover the proceeds of the sale of passenger tickets from a travel agency which had filed a petition in bankruptcy. The court rejected Eastern's argument that the travel agency held the sales proceeds in trust. In reaching this conclusion it stated:

> Here the relationship remained in practical fact that of debtor-creditor. The contract nowhere required [the travel agency] to keep the proceeds of Eastern's ticket sales separate from any other funds, whether [the travel agency's] own funds or the proceeds of other airlines' ticket sales. Nor was any specific restriction placed upon [the travel agency's] use of the supposed trust funds. [The travel agency] was left free to use what it received for its own benefit rather than Eastern's.... [I]n the absence of any provision requiring [the travel agency] to hold the funds in trust by keeping them separate, and otherwise restricting their use, the label "trust" could in these circumstances and for

present purposes have no legal effect. *See In re Penn. Central Transportation Co.,* 328 F.Supp. 1278 (E.D.Pa.1971); Scott on Trusts Section 12.2 (3d ed.).

*Id.* at 1071–72.

▪ Other courts faced with similar contractual situations have also examined into the substance of the relationship to ascertain whether or not a trust was formed notwithstanding the label "trust". The cases indicate that the crucial factor in determining whether a trust relationship is created in an agreement is the presence of a duty to segregate funds purportedly "held in trust". *See, e.g. In re Shulman Transport Enterprises, Inc.,* 744 F.2d 293 (2d Cir.1984) (no fiduciary relationship established by International Air Transport Association ("IATA") Agreement between freight forwarder and airline since agreement did not provide that freight forwarder segregate from its general funds monies collected for the air carrier or restrict use of those funds); *Carlson Inc. v. Commercial Discount Corp.,* 382 F.2d 903, 904 (10th Cir.1967) (reclamation petition denied where no trust relationship was found despite words of trust in agreement); *Lord's Inc. v. Maley,* 356 F.2d 456, 458 (7th Cir. 1966); *Harvey Brokerage Co. v. Ambassador Hotel Corp.,* 57 F.2d 727 (S.D.N.Y. 1932) (trust relationship can be rebutted by a showing of circumstances inconsistent with a trust, such as the debtor's right to use funds collected for another and commingle them with its own funds).

As in *Morales, supra,* the Agreement involved here provides that Vacation was required to transmit the proceeds of ticket

---

5. We note that the relationship between the Morales Travel Agency and the airlines was governed by the International Air Transport Association ("IATA") Agreement. That Agreement authorizes a travel agent to sell international tickets on behalf of an airline. The Agreement in the case at bar authorizes the travel agent to sell national tickets. The actual procedure for the sale of tickets and remission of proceeds to the ATC which then disbursed them to the airlines is the same in both Agreements. The *Morales* court construed the following language in the Agreement with respect to collection of proceeds of airline tickets: Monies collected by the

travel agency for tickets sold "shall be the property of the Carrier and shall be held by the Agent in trust for the Carrier or on behalf of the Carrier, until satisfactorily accounted for to the Carrier and settlement made." *Morales,* 667 F.2d at 1070.

The language in the Agreement in question here is virtually identical. The Agreement here states: All monies collected by the travel agency "shall be the property of the Carrier, and shall be held in trust by the Agent until satisfactorily accounted for to the Carrier." (ATC Agreement at para. 5.)

sales at regular specified intervals, whether Vacation actually collected that amount or not. (Petitioner's Exhibit No. 4 at 3). No segregation of funds was required. Vacation had the right to use the funds between settlement dates and to commingle them with its own funds. Thus, we find none of the indicia of a trust. Accordingly, we cannot find that Einhorn owed a fiduciary obligation to the airlines based upon that purported trust.

The principal authority upon which the creditors rely to establish that the ATC Agreement forms a trust is an unreported decision, *Forastieri v. Eastern Airlines*, Civ. No. 79-2544 (D.P.R. July 5, 1983) (U.S. District Judge Juan M. Perez-Gimenez), which was a libel suit. Evidently, that court overlooked the First Circuit decision in *Morales, supra*. In any event *Forastieri* is clearly distinguishable from the case at bar. In a decision granting the defendant airline's summary judgment motion on a conversion counterclaim, the District Court found that the corporation had failed to properly contest the summary judgment motion. Therefore, it concluded that a determination of liability was justified. However, in also finding the corporate officers liable on a conversion claim, the court found that the airline had submitted sufficient evidence of their wrongful use of corporate funds to impose liability upon the officers. (*Id.* at 12). No such evidence has been submitted in this case.[6]

### B

■ We turn next to the involuntary petition filed against Vacation. We find that based upon the testimony given and the evidence submitted, the petitioning creditors have established that there were debts owed to them by Vacation at the time the involuntary petition was filed. The Debit Memos and letters placed into evidence indicate that Vacation owed the petitioning creditors more than $700,000 at the time the involuntary petition was filed. Once

debts are established the burden is on the debtor to offer evidence to the contrary. No such evidence was offered by Vacation.

We next address whether or not Vacation was "generally not paying" its debts as they became due at the time the petition was filed, thus entitling the petitioning creditors to entry of an order of relief.

■ In an involuntary case it is the burden of the petitioning creditors to establish that the debtor is generally not paying its debts as they become due. 11 U.S.C. Section 303(h)(1). *In re SBA Factors of Miami, Inc.*, 13 B.R. 99, 100 (Bkrtcy.S.D.Fla. 1981); *In re Win-Sum Sports, Inc.*, 14 B.R. 389, 391 (Bkrtcy.D.Conn.1981). However, no hard and fast rules apply in determining whether an entity complies with this standard. In its discussion of the standard Collier's states:

> Congress ... did not make explicit what "generally not paying" under section 303(h)(1) means. A definitive answer cannot be found in the Code. This was emphasized by the Second Circuit in *In re B.D. Int'l. Discount Corp.* [701 F.2d 1071 (2d Cir.), *cert. denied*, 464 U.S. 830 [104 S.Ct. 108, 78 L.Ed.2d 110] (1983)]. The court declined to set up a standard.... (Citations omitted).

2 Collier on Bankruptcy, para. 303.12 at 303–52 (15th ed. 1985).

Collier's further states:

> This ground for relief focuses on the failure to pay debts in the ordinary course as they become due. This is somewhat different than the debtor's inability to pay. In effect section 303(h)(1) is a "no-fault" statute. Either the debtor is or is not generally paying its debts as they become due. (Citations omitted). *Id.*

The "generally not paying" standard which has evolved is thus a flexible one, *In re Win-Sum Sports, Inc., supra* at 392, focusing on the failure to pay debts in the

---

**6.** The debtors also argue that since the creditors' claims in this case have their genesis in a single contract, the ATC Agreement, there is only one claim for purposes of the involuntary filing.

We reject this theory inasmuch as the ATC Agreement clearly states: "[t]he right ... of the air carriers ... shall be several and not joint." Para. 25 at 10.)

ordinary course as they become due. "Generally not paying" has been construed to mean that the debtor is "regularly missing a significant number of payments which are significant in amount in relation to the size of the debtor's operation." *In re All Media Prop., Inc.*, 5 B.R. 126, 143 (Bkrtcy.S.D.Tex.1980), *aff'd.* 646 F.2d 193 (5th Cir.1981).

In determining whether a debtor is paying its debts as they become due Collier's states:

> [T]he court may look at more than merely the amount of indebtedness. It may examine the debtor's overall contemporaneous handling of its affairs in evaluating whether to order relief. The factors of number, amount, and materialty of non-payment must be viewed in that context. If the debtor is conducting his financial affairs in a manner inconsistent with good faith and outside the ordinary course of business, it may affect the court's determination of the issue. The debtor's overall payment activity and payment practices are relevant. (Citations omitted).

2 Collier on Bankruptcy, para. 303.12 at 303–55 (15th ed. 1985).

Since the standard is a flexible one, all circumstances surrounding the payment practices of the alleged debtor should be explored. The court in *In re All Media Prop., Inc., supra,* explained this more fully as follows:

> The new test for involuntary petitions was adopted not to restrict and limit the involuntary process but was included to allow more flexibility.
>
> . . . .
>
> [T]he court believes that generally not paying debts includes ... regularly missing a significant number of payments which are significant in amount in relation to the size of the debtor's operation. Where the debtor has few creditors the number which will be significant will be fewer than where the debtor has a large number of creditors. Also, the amount of debts not being paid is important. If

the amounts of missed payments are not substantial in comparison to the magnitude of the debtor's operation, involuntary relief would be improper.

5 B.R. 142–43.

 The debts owed the three petitioning creditors on the date the involuntary petitions were filed were obviously large, of consequence and long overdue. We find that the creditors have established those elements necessary for relief under 11 U.S.C. Section 303.

Accordingly, it is ordered that an order for relief be entered against Vacation and that the petition against Einhorn be dismissed.

SO ORDERED.