**In re Albert RIMELL, Harriet Rimell, Morris Sherman, Rosalyn Margulis, Lawrence Margulis, Alleged Debtors.**

**Bankruptcy Nos. 89–04383–BSS, 89–04382–BSS, 89–04385–BSS, 89–04386–BSS and 89–04387–BSS.**

United States Bankruptcy Court, E.D. Missouri, E.D.

Feb. 5, 1990.

Eugene Portman, Gerald A. Rimmel, Clayton, Mo., for debtor.

Susan Corey Waters, St. Louis, Mo., for First Bank.

Stephen B. Higgins, David A. Warfield, St. Louis, Mo., for Mark Twain Bank.

Robert H. Brownlee, Mark V. Bossi, St. Louis, Mo., for Mercantile Bank.

David Rubin, St. Louis, Mo.

Leonora S. Long, Attorney/Advisor, Office of the U.S. Trustee, St. Louis, Mo.

## MEMORANDUM OPINION AND ORDER

BARRY S. SCHERMER, Bankruptcy Judge.

### INTRODUCTION

On October 18, 1989, petitioners, Mark Twain Bank (hereinafter "Mark Twain") and First Bank filed, pursuant to 11 U.S.C. § 303(b)(2), an involuntary Chapter 7 petition against Alleged Debtor Harriet Rimell. This filing was one of a series of actions in which Mark Twain and First Bank, in addition to The Boatmen's National Bank of St. Louis (hereinafter "Boatmen's"), and Mercantile Bank of St. Louis National Association f/k/a Mercantile Bank National Association (hereinafter "Mercantile" and collectively as "the Creditors"), filed involuntary Chapter 7 petitions against Albert Rimell, Morris Sherman, Rosalyn Margulis, and Lawrence Margulis, pursuant to 11 U.S.C. § 303(b)(1). Harriet Rimell asserts that she has more than eleven creditors, and since § 303(b)(2) permits two petitioning creditors to prevail only when a debtor has fewer than eleven creditors, the petition must be denied.

While Harriet Rimell's case shares defenses common to the other four debtors listed above, the issue of whether sufficient creditors exist to avoid her being placed in an involuntary Chapter 7 bankruptcy is unique to her case. Thus, this opinion will be divided into two main sections—Ms. Rimell's § 303(b)(2) counting of creditors, and the overriding involuntary case involving all five defendants.

### JURISDICTION

This Court has jurisdiction over the subject matter of the proceeding pursuant to 28 U.S.C. §§ 151, 157, 1334 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(O).

## I.
### Ms. Rimell's § 303(b)(2)
### Creditor Counting
#### FACTS

In her answer, Harriet Rimell listed seventeen (17) creditors of her estate. Late in the afternoon of the day before this case went to trial, counsel for Ms. Rimell filed an amendment to this list (as required by Rule 1003(b)) which enumerated four additional creditors. At the commencement of the trial, this Court denied Ms. Rimell's Motion to Amend Pleadings as untimely and prejudicial to the rights of the petitioning creditors to seek discovery and joinder of such creditors. Between December 18 and January 3, 1990 (the date of resumption of the December 18, 1989 trial), this Court permitted Ms. Rimell to add five creditors to those already claimed in her answer. However, this Court denied her attempted addition during the continued trial of the St. Louis County Collector as a twenty-third creditor. Thus, Ms. Rimell has listed a total of twenty-two creditors which this Court must consider in determining whether the Plaintiffs have met their burden.

At trial, Harriet Rimell testified that in January or February, 1989 she and her husband, Albert Rimell, created the Rimell Family Trust (hereinafter the "Trust") to pay all bills related to expenses and maintenance of the Rimells' residence. Many of the creditors listed in Ms. Rimell's pleadings were paid directly from the Trust, whose sole source of funds, Ms. Rimell testified, was her regularly-contributed paychecks. Ms. Rimell also testified that the Trust was created solely "for estate planning purposes".

Ms. Rimell has listed creditors of both herself and the Trust. Thus, in order to determine the number of creditors she has for purposes of § 303(b)(2), this portion of the Opinion will be divided into two sections—creditors of Ms. Rimell personally, and creditors of the Trust.

### A. Creditors of Ms. Rimell
#### 1. *Sears, Roebuck and Company*

■ Ms. Rimell listed Sears, Roebuck and Company (hereinafter "Sears") as holding a $426.92 claim for merchandise purchased. In 1962, Mr. Rimell opened a Sears account under the name of "Albert Rimell", with Harriet Rimell as an authorized signator. Thus, while Harriet Rimell was capable of purchasing merchandise under this account, at no time has Sears held her personally liable for any debt incurred.

Section 101(4) of the Bankruptcy Code defines a "claim" as a "right to payment". In order for the creditor to have a *right* to payment, the debtor must be personally liable. Although Teresa Nadolski, a bankruptcy representative from Sears, testified that the company may choose to "go after" Ms. Rimell if her husband was unable to pay his bill, this Court was not presented with evidence sufficient to allow a conclusion that Ms. Rimell was personally liable. Given the absence of Ms. Rimell's personal liability, this Court concludes that Sears does not have a claim against Ms. Rimell and thus may not be counted as a creditor for purposes of § 303(b)(2) of the Bankruptcy Code.

#### 2. *Pioneer Bank*

■ Pioneer Bank's involvement with the Rimells arose from a $1,225,846.61 commercial loan which it made to Albert Rimell, Inc. On February 17, 1988, Harriet Rimell executed a personal guaranty of the indebtedness. Under the terms of the guaranty, Pioneer reserved the right, whenever the loan came due, to require Ms. Rimell to pay the amount due on demand. At trial Jean Marcus, Pioneer's Vice President of Real Estate Lending, testified that although the loan was past due as of the filing date, Pioneer had not demanded payment of the loan pursuant to her personal guaranty. Thus, as of the filing date Pioneer Bank held a contingent claim against Ms. Rimell and this Court will count the Pioneer Bank as a creditor for purposes of § 303(b)(2).

#### 3. *R.B. Platt Development Co.*

■ R.B. Platt Development Company (hereinafter "Platt") holds a claim of $659.43 for installation of windows in the

Rimell family home. On January 3, 1990, Max Platzelman, president of Platt, testified that his workmen installed the windows sometime in October, but was unable to give an exact date. The only existing written evidence of indebtedness was a letter dated December 14, 1989, in which Albert Rimell requested a bill from Platt, and a November 26, 1989 invoice from Platt.

Although Mr. Platzelman's testimony fails to conclusively prove that Platt had a claim against Ms. Rimell on the date of her filing, this Court believes that Ms. Rimell's testimony is dispositive in determining whether such a claim did exist before October 18, 1989. At trial Ms. Rimell stated that sometime in July she requested that Platt perform the work. Platt agreed to this arrangement. Therefore in July 1989 a contract existed between Platt and Ms. Rimell for which Ms. Rimell was personally liable. Given this liability, this Court holds that, for purposes of § 303(b) of the Bankruptcy Code, a party becomes a creditor at the time a debt is incurred, as in the instant case when an enforceable contract was formed.

### 4. *St. Louis County Farm Bureau*

Ms. Rimell listed a claim of $87.48, which she owed to St. Louis County Farm Bureau for an insurance premium. However, Ms. Rimell testified that (on August 25, 1989) she made a prepayment of that amount for health insurance coverage for the months of September, October, and November. Thus, Ms. Rimell owed nothing to this creditor on October 18, 1989, and St. Louis County Farm Bureau is excluded as Ms. Rimell's creditor for purposes of § 303(b)(2).

### 5. *Southwestern Bell Telephone Company*

Ms. Rimell listed Southwestern Bell Telephone Company (hereinafter "Southwestern Bell") as holding a claim for $59.84. Much like Sears, the Southwestern Bell account was maintained only in the name of "Albert Rimell". While Ms. Rimell may have written checks in payment of the Rimells' Southwestern Bell bills from family funds, her status was basically the same as in the case of the Sears charge account—only an authorized user. Thus, under the same rationale, this Court holds that an authorized user of services does not place one in personal liability to a provider of such services. Accordingly, Southwestern Bell is not included as a creditor.

### 6. *D & L Plumbing, Inc.*

On October 4, 1989, D & L Plumbing, Inc. (hereinafter "D & L") performed work in the Rimell's home for which it charged $50. However, due to its own business relocation, it failed to bill the Rimells until December 14, 1989, when Mr. Rimell insisted that D & L send them a bill. The petitioning Creditors claim that Mr. Rimell made this demand for a bill was made on the eve of trial solely for purposes of avoiding the entry of relief against Harriet Rimell. Therefore the Creditors argue that D & L should be excluded from Ms. Rimell's creditor count.

Sometime prior to October 4, 1989, Ms. Rimell requested by telephone that D & L perform work at the Rimell residence. Thus, on that date a contract was formed, and consequently a debt was incurred at that time. Thus, it follows that on October 18, 1989 the Rimells were indebted to D & L. The company's failure to send a bill until December 14, 1989, and then only upon the debtor's insistence, is of little consequence. The fact remains that D & L held an enforceable claim against Ms. Rimell before the date of the filing, and thus D & L shall be counted as a § 303(b)(2) creditor.

### 7–11. *Ms. Rimell's Attorneys*

Counsel has represented Harriet Rimell both in this and other legal matters. In the instant case, Ms. Rimell is represented by Eugene Portman and Gerald A. Rimmel. In the past Ms. Rimell sought the advice and expertise of Messrs. Julius Berg, David Freyman, and Arthur Slonim, all of whom are attorneys and have ceased their legal representation in any pending matters. The petitioning Creditors argue that this Court should exclude all five of the attorneys from the creditor count as "insiders", as prohibited by § 303(b)(2).

While § 303(b)(2) excludes the counting of insiders as creditors in an involuntary proceeding, the Court has found no cases which adequately define the term in this limited context, nor have the parties cited any such authority. Section 101(30) of the Bankruptcy Code defines "insider", in pertinent part, as follows:

(A) if the debtor is an individual—

   (i) relative of the debtor or of a general partner of the debtor;

   (ii) partnership in which the debtor is a general partner;

   (iii) general partner of the debtor; or

   (iv) corporation of which the debtor is a director, officer, or person in control;

Additionally, the legislative history of § 101(30) is instructive. Congress has stated that an "insider" may be described as a person or entity with "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor". S.Rep. No. 95–989, 95th Cong., 2d Sess., *reprinted in* 1978 *U.S.Code Cong. & Admin.News,* pp. 5787, 5810.

Both the statute and its legislative history indicate that an insider may be someone who currently enjoys a fiduciary relationship with the debtor. This Court concludes that this definition is not limited and should be applied flexibly, on a case by case basis. Certainly an attorney, who invariably acquires confidential client information and whose relationship is governed by rules of professional conduct, may come under this categorization. This Court holds that the definition of "insider" provided in § 101(30) shall include an attorney who is owed money from a client who is currently defending the client in an involuntary bankruptcy petition. Applying the above rule, it is apparent that because both Mr. Portman and Mr. Rimmel represent Ms. Rimell in the instant case, neither would be able to pursue his pecuniary remedies as a petitioning creditor without also breaching his duty to his client. Such action would create an impermissible conflict of interest between attorney and client. Therefore, neither shall be counted as Ms. Rimell's creditors.

A different issue concerns Messrs. Freyman, Berg, and Slonim—none of whom currently represent Ms. Rimell. The Creditors argue that these three attorneys should be excluded from the § 303(b)(2) counting of creditors because each of them have testified to their continuing and unbreachable attorney/client relationship with Harriet Rimell. In essence, the Creditors' proposed rule would exclude *per se* any attorney who had represented the debtor in any prior matter, regardless of whether it was in any way related to the pending involuntary bankruptcy. This Court believes that such an exclusionary rule is both overbroad and unwarranted. While an attorney representing the debtor in the involuntary proceeding obviously would be called upon to take a position adverse to that of his client, the same cannot be said for a former attorney. In the latter scenario, the attorney is free to pursue the collection of his fees as would any other creditor. Thus, this Court holds that for purposes of § 303(b)(2) of the Bankruptcy Code an attorney who represented the debtor in a prior, unrelated matter may not be excluded *per se* from being counted as a creditor of the alleged debtor. Given this rule, it follows that Mr. Freyman, Mr. Slonim, and Mr. Berg will be counted as creditors.

## B. Creditors of the Rimell Family Trust

█ The remaining eleven creditors [1] were paid after the filing of the involuntary petition by the Rimell Family Trust, which, according to Ms. Rimell's testimony, derived its income solely from her paycheck deposits. The Creditors argue that all post-petition payments from the Trust made on pre-petition debt are excludable under § 303(b)(2) of the Bankruptcy Code. Section 303(b)(2) states:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under Chapter 7 or 11 of this title—

---

1. This group included Tiffany Marble Company, Rollins Protective Service, Delmar Financial Company, CenCom of Missouri, Lawnicure Lawn Service, Union Electric, Laclede Gas Company, Central Hardware, Schneider Service Company, Mastercard, and Famous Barr.

. . . .

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims;

Thus, the above language creates a checklist of creditors who may not be counted in determining whether the debtor has a sufficient number of creditors to place them in involuntary bankruptcy proceedings. Given the prior discussion of insiders and the inapplicability of the "employee" category to the instant case, the remainder of the discussion will focus on those enumerated Code sections which are applicable to this case.

The Creditors argue that certain creditors which Ms. Rimell listed should be excluded because they received post-petition transfers in violation of § 549(a). This Section states that:

(a) Except as provided in subsection (b) [2] or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.

The essence of this language, and a major focus of the Creditors' argument, is that a debtor may not, after the filing of the involuntary petition, pay pre-petition debts with money that was earned pre-petition. Ms. Rimell claims that she never made any such transfers. Instead, she argues that the post-petition transfers either were made by a third party—the Rimell Family Trust, or from Ms. Rimell's post-petition earnings. Therefore Ms. Rimell argues that these creditors should be included in the counting of her § 303 creditors. The petitioning Creditors argue that Ms. Rimell's claim is untenable for two reasons. First, the Trust does not constitute a legitimate third person from which a transfer could be made. Second, Ms. Rimell failed to carry her burden of proving that any post-petition transfers were made from her post-petition earnings.

**A. Transfers From The Rimell Family Trust**

Created on January 3, 1989, the Rimell Family Trust is revocable at any time. From its inception, Harriet and Albert Rimell served as co-trustees. The Trust, which held as its sole asset the Rimell residence,[3] supposedly derived all of its in-

---

**2.** Subsection (b) of § 549 states:

(b) In an involuntary case, a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.

Subsection (c) of § 549 is inapplicable to the instant case.

**3.** Ms. Rimell testified that at approximately the same time as the Trust was formed, the Trust entered into a loan for $100,000, using the Rimell residence as collateral. Of this sum, Ms. Rimell distributed the funds as follows: approximately $25,000 to pay off an existing debt on the house, between $10,000 and $20,000 for house renovation, and the remainder of the funds in equal proportions to her three children for no consideration. Ms. Rimell testified that

the main intent of the latter distribution was to provide for the medical care of her grandchild.

This is not the only transaction involving the alleged debtors which the Court finds suspect. First, on his June 1, 1988 personal statement, Albert Rimell stated to First Bank that he held cash in excess of $233,000, and government securities in excess of $17,000. In a separate financial statement, dated May 12, 1989, Mr. Rimell stated that he had cash and government securities totaling only $2,100. Second, within a year preceding the filing of the involuntary petition in the instant case, Mr. and Mr. Margulis conveyed their residence to LaRosa Enterprises, Inc., a Debtor-affiliated entity, for no consideration. Third, Morris Sherman conveyed six parcels of real estate for no consideration to Camelot Realty, Inc., a debtor-related corporation.

The Court hardly finds these transfers of cash and real estate coincidental. Rather, it appears to the Court that the alleged Debtors, in an effort to frustrate the collection efforts of creditors, sought to reduce as much as possible from their personal estates.

come from the paychecks of Harriet Rimell. Ms. Rimell testified that she deposited all of her earnings in the Trust account, save for some cash withdrawals made at the time of the deposit.

This Court believes that the Trust, rather than constituting a "third person", is merely a synonym and an alternative guise for Albert and Harriet Rimell. First, Ms. Rimell testified that she used the funds of the trust to pay all bills related to their home. Testimony further showed that Ms. Rimell used Trust funds to pay a great number of personal and family living expenses. When asked why she didn't use a personal account at another bank, her only reasons were that this arrangement was "more convenient", and that she was angry with the bank where she held her personal account. Given that Ms. Rimell's paychecks and the interest derived therefrom supposedly were the Trust's sole source of income, and that she used these funds for personal expenses and the upkeep of her home, this Court chooses to adopt the Creditors' view that the Rimell Family Trust served as little more than Harriet Rimell's "personal checking account". Second, it is difficult to ignore the completely intertwined relationship which the Rimells had with the Trust. Ms. Rimell's role as sole contributor of Trust income, the Rimell's presence as co-trustees, and the fact that the only Trust asset was the Rimell family home, all point to the fact that Trust transfers were in no way those of a "third person". In fact, Mr. Rimell himself contradicted the notion of the Trust's independence when he stated: "I consider Albert and Harriet Rimell and [the] Rimell Family Trust one and the same. Same assets, same vulnerability."

### B. Burden of Proving Source of Post–Petition Transfer Funds

Section 549 of the Bankruptcy Code requires that in order to be counted for purposes of § 303, creditors must be paid with funds earned after the filing date of the involuntary petition. Ms. Rimell has claimed that all post-petition transfers to listed creditors were made with post-petition earnings. Given her assertion of the transfers' validity, Rule 6001 of the Bankruptcy Code places upon her the burden of proof. She has failed to carry this burden. During the entire three days of trial, counsel for Ms. Rimell offered no evidence to prove that the funds used to pay creditors post-petition were earned prior to the October 18, 1989 filing of the involuntary petition. However, this Court is convinced, after the following examination of the evidence submitted, that the transfers were from pre-petition earnings.

In order to determine whether the funds were earned pre-petition, the Court must trace the deposits and debits of the Trust account. In so doing, the Court will use a "first in, first out" methodology. That is, the Court will assume that checks written against the account will reduce the oldest deposits first. The first step in tracing these funds is to determine the balance which existed on October 18, 1989—the date of the Creditors' involuntary petition filing. The Trust's account statement, dated November 8, 1989, provides that the account held $10,074.41 on October 10, 1989. After subtracting $3,661.94 for checks which cleared between October 11 and October 18, a balance of $6,412.47 remains. Thus, as of October 18, 1989, the balance of the Trust account was $6,412.47.

Before proceeding to the actual tracing of the funds, the Court wishes to address one other matter relating to the computation of the October 18, 1989 account balance. The November 8, 1989 statement of the Trust account shows deposits of $3,900 on October 19, $2,400 on October 26, and $2,400 on November 1. This Court chooses to exclude all three deposits from the Trust's pre-petition funds for the following reasons. First, the three checks were *credited* and *debited* to the account in the same amount on the *same day*. Prior Trust bank statements had never before reflected such "coincidental" occurrences. Thus, this Court concludes that the coincidental deposits and withdrawals into and out of the Trust were mere "wash" transactions which do not merit consideration. Second, Ms. Rimell testified that the only funds deposited were from her earnings. How-

ever, this Court has difficulty believing this statement when she made consecutive weekly deposits of $3,900, $2,400, and $2,400, each of which greatly exceed her usual $1,250 per week salary.[4] Ms. Rimell never presented any evidence showing the source of this excess in funds. Finally, the deposits were from Rimell Greystone, Inc., one of Mr. Rimell's companies, and the checks from the Trust were issued to another of Mr. Rimell's companies.

Regarding the actual tracing of the funds, the Court begins with a balance of $6,412.47 as of October 18, 1989. From this initial amount the Court subtracts all checks which cleared beween October 18 and November 27, 1989—the clearance date of the last check in payment of Ms. Rimell's pre-petition creditors. After subtracting these amounts, a balance of $2,414.24 in pre-petition funds remains. *See* Appendix 1 of this Opinion. Because there is money remaining in the Trust's pre-petition balance, it follows that all of Ms. Rimell's creditors were paid with pre-petition funds. Given this pre-petition payment, this Court may not count any of these creditors for purposes of § 303(b)(1).

## CONCLUSION

The above analysis reveals that, for purposes of her § 303 creditor counting, Harriet Rimell has the following six creditors— Pioneer Bank, R.B. Platt Development Co., D & L Plumbing, Inc., Julius Berg, David Freyman, and Arthur Slonim. Because

this number is less than eleven (11), this Court holds that Harriet Rimell's defense, based upon an insufficient number of petitioning creditors, fails.

## II. The Involuntary Bankruptcy of the Four Remaining Debtors

### FACTS

The Creditors made fifteen separate loans to various entities with which the alleged Debtors are associated. Each of these loans was personally guaranteed by various combinations of Debtors. The Creditors claim the each of these loans is currently due and owing, and now seek to enforce the personal guarantees against each of the alleged Debtors. None of the alleged Debtors disputes the amounts due, the genuineness or the terms of the guarantees, or the effect of their terms. The parties stipulated at trial that the claims of the petitioning creditors exceed $5,000.00 more than the value of any lien of the Debtors securing such claims. However, the alleged Debtors maintain that each of the petitioners' loans is subject to a bona fide dispute which would preclude the counting of those creditors for purposes of § 303(b)(1).[5] More specifically, the alleged Debtors claim that the loans are not yet due because each of the four Creditors agreed at the time of each loan transaction that, upon Mr. Rimell's request, they would extend the terms of the loan, lower the current rate of interest on the loan, or amend the loans to provide terms more

---

**4.** An examination of the bank statements of the Rimell Family Trust reveals that during the relevant time period Ms. Rimell made the following deposits into the Trust account:

| Date | Amount |
| --- | --- |
| 10/05/89 | $5,250.00 |
| 10/19/89 | $3,900.00 |
| 10/26/89 | $2,400.00 |
| 11/01/89 | $2,400.00 |

The Court notes that on October 19, 1989—two weeks after her previous deposit—Ms. Rimell deposited $3,900 into the Trust account. This figure exceeds by $1,400 the $2,500 she would have received from two weeks salary. One week later, Ms. Rimell deposited $2,400 into the Trust account—a sum which exceeds her $1,250 per week salary by $1,150. Finally, Ms. Rimell's second $2,400 deposit, made one week after the first, again exceeds her salary by the same $1,150.

**5.** In addition to claiming that there exists a bona fide dispute as to the debts, the Debtors also asserted in their Answers the following affirmative defenses, on which they presented no evidence at trial: 1) No final judgment has been rendered in the Creditors' lawsuits (alleging similar claims) filed against the Debtors in the Circuit Court of St. Louis County; 2) Debtors are paying all of their just and proper debts as they mature; 3) The Creditors have filed their Petitions in bad faith and have prosecuted this proceeding with malice and without probable cause; and 4) The failure of the Creditors to fulfill and perform the commitments and obligations owed to the Debtors regarding the loans in controversy estops the Creditors from obtaining the relief sought in their Petition. The Court considers these defenses abandoned.

favorable to the alleged Debtors.[6] In sum, the alleged Debtors contend that the four Creditors promised, at the time of each initial loan transaction, that they would, if requested, continually extend the loan until the alleged Debtors had sold the respective property which collateralized the loans.[7]

The alleged Debtors offered no documentary evidence reflecting or embodying the alleged agreement. However, the alleged Debtors have offered two theories which evidence their agreements with the Creditors. First, they claim that the parties at each loan transaction made an express oral agreement that the Creditor would not call the loan if it came due before the property was sold. All loan officers taking part in each of the transactions have denied ever entering into such agreements. Second, the alleged Debtors maintain, in the alternative, that the agreements are evidenced by the parties' prior course of dealing. In short, the alleged Debtors claim that because the Creditors had refused to call prior loans as they became due, this Court should infer that the parties reached a similar agreement in the instant case[8].

## DISCUSSION

■  Section 303(b)(1) of the Bankruptcy Code states:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under Chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability *or the subject of a bona fide dispute,* or an indenture trustee representing such holder, if such claims aggregate at least $5,000 more than the value of any lien on

property of the debtor securing such claims held by the holders of such claims; (emphasis added)

Thus, if there is a bona fide dispute as to the debtor's liability, § 303(b)(1) precludes the court from counting that creditor for purposes of the involuntary proceeding. In the instant case, the Debtors claim that the bona fide dispute as to when each of their loans is due precludes this Court from counting any of the Creditors in this § 303 proceeding. Thus, if the alleged Debtors' assertion is correct, the Creditors' efforts to place them in involuntary bankruptcy must fail. As in the previous issue involving Harriet Rimell, it is the alleged debtors who bear the burden of proving that such a bona fide dispute exists. *In re Einhorn,* 59 B.R. 179, 185 (Bankr.E.D.N.Y.1986) (once debts are established, debtor bears burden of proving otherwise).

■  This Court finds that for purposes of § 303(b)(1) the alleged Debtors have failed to offer sufficient evidence to raise this controversy over contractual terms to the level of a bona fide dispute. In short, this Court concludes that because no agreement existed such as that asserted by the alleged Debtors, there could be no bona fide dispute over the terms of the "agreement".

### A.  Express Oral Agreement

Albert Rimell testified that each Creditor orally agreed, at the time of the loan transaction, that it would extend the terms of the loan, lower the rate of interest, or amend the loan with terms more favorable to the alleged Debtors. While this Court has little doubt that Mr. Rimell may have made such requests, there is no evidence to confirm that the parties ever *agreed* to such terms. First, all four of the bank

---

**6.**  Alleged Debtor Albert Rimell testified that each of the Creditors basically agreed that he could request these amendments as he wished, provided such requests were reasonable.

**7.**  Mr. Rimell testified that the Creditors were well aware at the time of each loan transaction that Mr. Rimell and his partners were seeking to purchase real estate for speculative purposes. That is, the Creditors knew that the loans could not be paid off until the real estate had been

sold. Thus, Mr. Rimell claims that the Creditors' promises not to call the loans when they came due were logical, foreseeable occurrences.

**8.**  Testimony at trial reflects the fact that while Mercantile never extended any of its loans with the Debtor-affiliated partnerships, it did refinance some of these loans. This Court chooses to treat these actions as one and the same.

representatives denied, under oath, that they ever agreed to such terms. Second, the alleged Debtors have failed to offer one piece of documentary which reflects the terms of the agreements which they assert, including any notes of such agreements. Thus, this Court concludes that, contrary to the alleged Debtors' assertions, the parties in this case never orally agreed to extend, modify, or alter the existing written terms of the loans. Therefore there could be no "bona fide dispute" as to the terms of the agreement as none ever existed.

### B. Course of Dealing

The alleged Debtors also contend that because the Creditors had refused to call prior loans as they became due, this Court should infer from this prior course of dealing that an extension of loan terms took place in the instant case. This Court, however, does not believe that prior loan transactions between parties are sufficient to constitute a "course of dealing", as the same might be understood in general contract law. Instead, given that each prior loan had differing and unique terms, this Court chooses to treat each loan transaction as a separate, independent agreement. Thus, by definition there could be no prior course of dealing from which this Court could infer that the parties agreed in advance to the terms of future borrowings which the alleged Debtors assert in the instant case.

### CONCLUSION

This Court has concluded that the parties did not, either orally or through prior course of dealing, agree to alter, extend, or modify the existing written contractual terms on any of the loans in the instant case. Given that the parties did not agree to such terms, it follows that there could be no bona fide dispute. Similarly, in the case of Harriet Rimell, an examination of all creditors revealed that the requisite number of petitioning creditors exist. Accordingly, it is

ORDERED that, pursuant to § 303 of the Bankruptcy Code, an Order for relief under Title 11, Chapter 7 is hereby entered against Harriet Rimell, Albert Rimell, Rosalyn Margulis, Lawrence Margulis, and Morris Sherman.

### APPENDIX 1

| Date Check Cleared | Check No. | Check Amount | Pre–Petition Creditor | Pre–Petition Balance |
|---|---|---|---|---|
| October 18 | | | | $6,412.47 |
| 18 | 257 | $ 55.70 | | 6,356.77 |
| 19 | 270 | 10.68 | | 6,346.09 |
| 20 | 255 | 30.00 | | 6,316.09 |
| 20 | 269 | 100.00 | | 6,216.09 |
| 23 | 265 | 33.00 | | 6,183.09 |
| 23 | 268 | 45.00 | Rollins | 6,138.09 |
| 23 | 271 | 73.00 | | 6,065.09 |
| 25 | 273 | 55.00 | | 6,010.09 |
| 30 | 274 | 81.50 | Cencom | 5,928.59 |
| 30 | 275 | 50.00 | Tiffany Marble | 5,878.59 |
| 30 | 276 | 1,216.00 | Delmar Financial | 4,662.59 |
| 31 | 278 | 171.50 | | 4,491.09 |
| November 1 | 280 | 23.70 | | 4,467.39 |
| 2 | 283 | 496.50 | | 3,970.89 |
| 6 | 279 | 25.00 | | 3,945.89 |
| 8 | 282 | 334.69 | | 3,611.20 |
| 10 | 292 | 80.99 | Laclede Gas | 3,530.21 |
| 10 | 294 | 104.07 | Central Hardware | 3,426.14 |
| 13 | 285 | 129.50 | Schneider Service | 3,296.64 |
| 13 | 286 | 21.95 | | 3,274.69 |
| 13 | 289 | 59.84 | | 3,214.85 |

| Date Check Cleared | Check No. | Check Amount | Pre–Petition Creditor | Pre–Petition Balance |
|---|---|---|---|---|
| November 13 | 290 | $ 12.75 | Famous Barr | $3,202.10 |
| 13 | 293 | 85.00 | Lawnicure | 3,117.10 |
| 14 | 287 | 44.70 | | 3,072.40 |
| 14 | 288 | 50.84 | | 3,021.56 |
| 15 | 291 | 96.32 | Union Electric | 2,925.24 |
| 15 | 296 | 81.50 | | 2,843.74 |
| 18 | 293 | 85.00 | | 2,758.74 |
| 22 | 295 | 15.00 | | 2,743.74 |
| 24 | 298 | 79.50 | | 2,664.24 |
| 24 | 300 | 50.00 | | 2,614.24 |
| 27 | 301 | 200.00 | Mastercard | 2,414.24 |